UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:

Beth Tracy Stollman,                                    Case No. 08-50331
                                                        Chapter 7
            Debtor.                                     Hon. Phillip J. Shefferly
_____/

Morganroth & Morganroth, PLLC, Debra N.
Ribitwer & Associates, PC and Virchow, Krause &
Company, LLP

            Plaintiffs,

vs.                                                     Adv. Proc. No. 08-4894

Beth Tracy Stollman,

            Defendant.
_____/

## OPINION GRANTING PARTIAL SUMMARY JUDGMENT TO PLAINTIFFS

### I. Introduction

Beth Tracy Stollman is the Debtor in this Chapter 7 case and the Defendant in this adversary

proceeding. The Plaintiffs are two law firms and one accounting firm, all of whom rendered services

for the Debtor in connection with her divorce proceeding. After the Debtor filed this Chapter 7 case,

the Plaintiffs brought this adversary proceeding seeking a determination of the non-dischargeability

of the debts owed to them by the Debtor and also objecting to the Debtor's discharge. The Plaintiffs

filed a motion for summary judgment, but only with respect to the non-dischargeability of their

debts. On January 23, 2009, the Court held a hearing and took the motion under advisement. For

the reasons set forth in this opinion, the Court has determined to grant the Plaintiffs a partial

summary judgment holding that $147,595.38 of the Debtor's total debts to the Plaintiffs is non-

dischargeable, allocated one-third to each of the three Plaintiffs, but denying the balance of the relief requested in the Plaintiffs' motion.

## II. <u>Facts</u>

On August 31, 1997, the Debtor, a licensed attorney, married David Stollman, a real estate developer. On September 28, 2005, the Debtor engaged Debra N. Ribitwer & Associates, PC ("Ribitwer"), a law firm, to file a divorce action against her husband. The engagement was memorialized in an agreement signed by the Debtor and Ribitwer. (Plfs.' Br., Ex. A (Docket #17).) On September 29, 2005, the Debtor's divorce action was filed in Oakland County Circuit Court. On February 22, 2006, Ribitwer entered into an agreement with Virchow Krause & Company, LLP ("Virchow"), an accounting firm, to review and analyze financial information and provide expert witness testimony in connection with the Debtor's divorce action. The agreement between Virchow and Ribitwer stated that the Debtor would be "responsible for" Virchow's fees. (Plfs.' Br., Ex. B (Docket #17).) The Debtor signed the Virchow agreement under the notation "accepted by." On July 24, 2006, the Debtor retained another law firm, Morganroth & Morganroth, PLLC ("Morganroth"), to provide legal services to the Debtor as co-counsel in her divorce action. The record does not contain any written retention agreement between Morganroth and the Debtor.

During the divorce case, Ribitwer, Virchow and Morganroth billed substantial sums to the Debtor for services rendered on her behalf. The Debtor's unpaid balances with each of these professionals grew large over time. On March 21, 2007, because of the unpaid fees owing by the Debtor, Ribitwer withdrew as the Debtor's co-counsel. On the same date, the Debtor and Ribitwer executed a document entitled "Attorney's Lien." (Plfs.' Br., Ex. L (Docket #17).) The Attorney's Lien states that Ribitwer asserts an attorney's lien against all of the personal property and real

property in which the Debtor "has an interest, or receives an interest," in the course of her divorce proceeding "to secure the outstanding fees" owed to Ribitwer by the Debtor in the amount of $220,490, plus any additional attorney fees, costs and interest that may be incurred. The Attorney's Lien was recorded with the Oakland County Register of Deeds on March 21, 2007. Morganroth continued to represent the Debtor in the divorce action and Virchow continued to render services to the Debtor as well, even though both of those firms also had large outstanding balances owing to them for fees.

On November 16, 2007, the Debtor and her husband entered into a Divorce Settlement Agreement ("Settlement Agreement"). (Compl., Ex. 4 (Docket #1).) Paragraph 17 of the Settlement Agreement provided as follows:

> Each party shall be fully responsible for his or her own attorney fees and other costs of litigation. **Each of the parties' respective attorneys is granted a lien on all real and personal property and assets or the proceeds thereof, awarded their respective client's hereunder or hereafter acquired, to secure the payment of the attorney fees, costs and expenses remaining outstanding and due each attorney at the conclusion of this matter.** Husband and Wife shall execute any security instruments, mortgages, or the like upon the request of their respective attorneys. Attorney fees and costs were incurred for services necessary for the preservation of assets, matters related to division of business assets, tax planning, and securing adequate support and maintenance. Husband and Wife shall be solely responsible to pay from individual assets allocated to them, any attorney fees, expert witness fees, investigation fees, costs associated with their divorce action and other related expenses in excess of attorney fee payments remitted to date. (Emphasis added.)

On November 20, 2007, the Oakland County Circuit Court entered a Judgment of Divorce ("Judgment"). (Compl., Ex. 5 (Docket #17).) Like the Settlement Agreement, the Judgment contained a provision regarding attorney fees and costs. Paragraph 16 of the Judgment mirrors paragraph 17 of the Settlement Agreement, with no substantive changes.

On November 20, 2007, Morganroth sent a Notice of Attorney Charging Lien ("Notice of

-3-

Charging Lien") to the Debtor stating that Morganroth asserted a common law lien as a result of unpaid legal fees and costs "against any and all funds, money judgments and proceeds recovered from, and any and all judgments or settlements derived out of the claims" of the Debtor in the divorce proceeding. (Plfs.' Br., Ex. O (Docket #17).) The Notice of Charging Lien was later recorded on March 21, 2008 with the Oakland County Register of Deeds together with a Notice of Claim that was signed by Morganroth on March 21, 2008. (Id.)

It is not entirely clear from the record how much the Debtor owed to Ribitwer, Virchow and Morganroth at the time of the Judgment on November 20, 2007, but it appears to have been substantial. Debra N. Ribitwer's affidavit states that Ribitwer was paid a total of $40,000 since Ribitwer was first retained by the Debtor on September 28, 2005 and that, as of the date of her affidavit, October 23, 2008, there remained past due and owing the sum of $218,369. (Plfs.' Br., Ex. F (Docket #17).) An affidavit of Barry P. Lefkowitz from Virchow states that the Debtor paid Virchow a total of $21,249.18 after Virchow was retained on February 22, 2006 and that, as of the date of his affidavit, October 24, 2008, there remained past due and owing the sum of $92,464.86. (Plfs.' Br., Ex. G (Docket #17).) Mayer Morganroth's affidavit states that Morganroth was paid a total of $25,000 since it was engaged on July 24, 2006 and that, as of the date of his affidavit, October 24, 2008, there remained past due and owing the sum of $258,910.42. (Plfs.' Br., Ex. E (Docket #17).)

Shortly after the Judgment was entered, the Debtor and the Plaintiffs signed three separate letters (collectively referred to as the "December Letters") relating to certain funds that the Debtor was entitled to receive under the Settlement Agreement and the Judgment. One of those funds consisted of a 401(k) Sharing Plan with Biltmore Management Services, Inc. ("401(k)"), and a

second fund consisted of certain stocks and mutual funds ("Investment Accounts") identified in the

Settlement Agreement. The first of the December Letters was signed on December 10, 2007 by the

Debtor and all of the Plaintiffs on Morganroth's letterhead addressed to the Debtor. (Plfs.' Br., Ex.

C (Docket #17).) The December 10, 2007 letter began by stating that its purpose was "to confirm

our voluntary and mutual understanding with respect to your share of the proceeds from" the 401(k)

and the Investment Accounts. The second and third paragraphs of the December 10, 2007 letter read

as follows:

> It is agreed that any proceeds derived from either the 401(k) and/or the Investment Accounts shall be split equally as follows: (1) twenty-five percent (25%) to Morganroth & Morganroth, PLLC; (2) twenty-five percent (25%) to Debra N. Ribitwer & Associates PC; (3) twenty-five percent (25%) to Virchow Krause; and (4) twenty-five percent (25%) to Beth Stollman, individually.

> Inasmuch as Morganroth & Morganroth, PLLC, Debra N. Ribitwer & Associates PC, and Virchow Krause are proper and appropriate lien holders as to all proceeds from the divorce, they hereby agree to execute a letter authorizing the distribution of all proceeds from the 401(k) and the Investment Accounts to be made payable to: Beth T. Stollman and Morganroth & Morganroth, PLLC Client Trust Account and for the further disbursement in conformity with the paragraph above.

The following day, December 11, 2007, the Debtor and the Plaintiffs all signed a second

letter on Morganroth's letterhead addressed to Biltmore Management Services, Inc. (Plfs.' Br., Ex.

P (Docket #17).) This letter began by informing Biltmore Management Services, Inc. that

Morganroth, Ribitwer and Virchow "are the proper and appropriate lien holders with respect to the

401(k) . . . held in the name of David Stollman." The second paragraph of this letter went on to state

that the signatories to the letter "hereby direct and require the disbursement of the proceeds

awarded" to the Debtor with respect to the 401(k) as follows:

> Beth Stollman's entire share of the [401(k)] Plan awarded to her shall be immediately disbursed in the form of a check made payable to Beth T. Stollman and Morganroth & Morganroth, PLLC Client Trust Account, and delivered to

Morganroth & Morganroth, PLLC, Attention: Mayer Morganroth, Esq., 3000 Town Center, Suite 1500, Southfield, MI 48075.

On December 13, 2007, the Debtor and the Plaintiffs all signed a third letter on Morganroth's letterhead, this one addressed to Hanley M. Gurwin, the attorney for David Stollman. (Plfs.' Br., Ex. Q (Docket #17).) This letter, like the December 11, 2007 letter, also began by stating that Morganroth, Ribitwer and Virchow "are the proper and appropriate lien holders against any and all funds, money judgments and proceeds recovered from, and any and all judgments or settlements derived out of the claims of " the Debtor in the divorce proceeding. This letter went on to direct that:

> any and all funds to be distributed to Beth Stollman shall be disbursed in the form of a check made payable to Beth T. Stollman and Morganroth & Morganroth, PLLC Client Trust Account, and delivered to Morganroth & Morganroth PLLC, Attention: Mayer Morganroth, Esq., 3000 Town Center, Suite 1500, Southfield, MI 48075.

Sometime after the December Letters were signed, as the Debtor's outstanding balances to the Plaintiffs remained unpaid, Morganroth began to inquire about the status of the 401(k) and the Investment Accounts. On March 12, 2008, Morganroth wrote to the Debtor reiterating its unwillingness to renegotiate the December Letters, and demanding that the Debtor comply with the December Letters by March 13, 2008. (Plfs.' Br., Ex. X (Docket #17).) The Debtor did not distribute the proceeds from the 401(k) or the Investment Accounts according to the terms of the December Letters. At a Federal Bankruptcy Rule 2004 examination taken on July 9, 2008 and continued on July 21, 2008, the Debtor admitted that the Charles Schwab statement for the 401(k) showed that $150,065.64 was paid out of the 401(k) on March 12, 2008. (Plfs.' Br., Ex. D, Rule

-6-

2004 Examination Tr. ("Rule 2004 Exam Tr.") at 155-56, July 9, 2008 (Docket #17).)[1]  The Debtor admitted that of this sum, $30,013.13 was withheld for the Debtor's federal withholding tax and that the balance, consisting of $120,052.51, was deposited directly in the Debtor's checking account on March 12, 2008. (Ex. D, Rule 2004 Exam Tr. at 156.)   The Debtor testified that she learned that she had received this sum on March 13, 2008 when she called her bank.  (Ex. D, Rule 2004 Exam Tr. at 303-04.)  However, she also admitted that she concealed this fact from the Plaintiffs even though Morganroth was contacting her at this time to find out where the money was.  (Ex. D, Rule 2004 Exam Tr. at 304-06.)  Despite the December 10, 2007 letter, the Debtor explained that she had learned that Charles Schwab was only authorized to send the money from the 401(k) directly to her. (Ex. D, Rule 2004 Exam Tr. at 164.)  During her Rule 2004 examination, the Debtor admitted that she did not disclose this fact to the Plaintiffs.  (Ex. D, Rule 2004 Exam Tr. at 164-65.)

During early April 2008, the Debtor also began receiving distributions from the Investment Accounts. (Ex. D, Rule 2004 Exam Tr. at 157.)  Although the Debtor explained at her Rule 2004 examination that the reason she received the 401(k) proceeds directly is because she had learned that Charles Schwab was only authorized to distribute them to her, in contrast, the Debtor admitted that she had expressly instructed her ex-husband to send any distributions from the Investment Accounts directly to her and made payable to her rather than in accordance with the terms of the December Letters. (Ex. D, Rule 2004 Exam Tr. at 54-55.)  In addition to these admissions, from April 18, 2008 to April 23, 2008, the Debtor and her former husband exchanged numerous emails about the Investment Accounts proceeds.  (Plfs.' Reply, Ex. J (Docket #33).)  In these emails, the Debtor

---

[1]  The Plaintiffs did not attach the entire transcript of the examination as an exhibit, but only portions of it.  The Debtor also only attached portions of the transcript as Ex. 4 to her response to the motion for summary judgment. (Docket #24.)

repeatedly instructed David Stollman that the proceeds from the Investment Accounts were to be paid directly to her and not to the Morganroth client trust account. (Plfs.' Reply, Ex. J (Docket #33).)

On numerous occasions during her Rule 2004 examination, the Debtor also admitted that she did not disclose to any of the Plaintiffs that she had received either the 401(k) proceeds or the proceeds from the Investment Accounts. (Ex. D, Rule 2004 Exam Tr. at 53-54 and 176-77.) The Debtor also admitted that she did not turn over any of the 401(k) proceeds or the Investment Accounts proceeds to any of the Plaintiffs after her receipt of them. (Ex. D, Rule 2004 Exam Tr. at 55 and 195.) Instead of complying with her agreement in the December Letters, the Debtor admitted that she concealed the receipt of those proceeds and immediately used all of the proceeds she received to pay her credit card bills and other personal expenses. (Ex. D, Rule 2004 Exam Tr. at 93-94 and 153-56.) The Debtor admitted that she understood that the Plaintiffs had liens on these proceeds because she granted the liens to the Plaintiffs in the Settlement Agreement and Judgment. (Ex. D, Rule 2004 Exam Tr. at 146-48 and 152.) Further, the Debtor admitted that she concealed the receipt of the proceeds and spent the money for her own personal benefit even though the December Letters contained express acknowledgments by the Debtor that the Plaintiffs each had liens on these proceeds and that the proceeds were to be disbursed directly to Morganroth under the December Letters. (Ex. D, Rule 2004 Exam Tr. at 153-55; 160-61; and 183-84.) Despite these admissions about her conduct, the Debtor nonetheless testified that she was trying to work out some "settlement" with the Plaintiffs and that she intended to eventually repay these amounts to the Plaintiffs from other sources. (Ex. D, Rule 2004 Exam Tr. at 175-76 and 185-86.)

Sometime after the Debtor received and spent the 401(k) proceeds and the Investment

Accounts proceeds, the Plaintiffs learned that the Debtor had received these proceeds, concealed the fact of their receipt from the Plaintiffs and spent the proceeds on her personal bills in contravention of the December Letters. Upon learning of these events, the Plaintiffs sought relief from the Oakland County Circuit Court because of the Debtor's failure to abide by the terms of the lien provisions under the Settlement Agreement and Judgment. On April 25, 2008, the Oakland County Circuit Court entered an order directing the Debtor to appear and show cause why she should not be held in contempt for failing and refusing to obey that court's orders regarding the liens and because of the Debtor's "fraudulent conversion" of the proceeds of the 401(k) and Investment Accounts. (Plfs.' Br., Ex. R (Docket #17).) A hearing was scheduled in the Oakland County Circuit Court on April 30, 2008. This hearing did not go forward because, on April 29, 2008, the Debtor filed her petition for relief under Chapter 7.

On August 6, 2008, the Plaintiffs filed this adversary proceeding. The Plaintiffs' joint complaint alleges that the Debtor owes the Plaintiffs the following amounts for outstanding fees and costs for services rendered in connection with her divorce case:

| | |
|---|---|
| Ribitwer | $ 218,369.00 |
| Morganroth | 258,910.42 |
| Virchow | 92,464.86 |

The complaint contains four counts. Count I seeks a determination that the debts owed by the Debtor to the Plaintiffs are non-dischargeable under § 523(a)(2)(A). Count II seeks a determination that the debts owed by the Debtor to the Plaintiffs are non-dischargeable under § 523(a)(6) of the Bankruptcy Code. Counts III and IV of the Plaintiffs' complaint seek a denial of discharge under §§ 727(a)(2), (a)(3), (a)(4) and (a)(7).

On October 24, 2008, the Plaintiffs filed a motion for summary judgment. The motion only

seeks summary judgment with respect to the Plaintiffs' request to determine the debts owed to them to be non-dischargeable under § 523(a). The motion does not address the § 727 counts in the Plaintiffs' complaint. Even though the Plaintiffs' complaint only seeks a determination of non-dischargeability under § 523(a)(2)(A) and § 523(a)(6), the Plaintiffs' motion requests summary judgment under § 523(a)(2)(A), § 523(a)(6) *and § 523(a)(4)* of the Bankruptcy Code. The Plaintiffs support their motion with a brief, numerous exhibits, a partial transcript of the Debtor's Rule 2004 examination, and affidavits signed by Debra N. Ribitwer, Barry P. Lefkowitz and Mayer Morganroth. The Plaintiffs' brief in support of their motion discusses the application of §§ 523(a)(2)(A) and (a)(6) as well as § 523(a)(4).

The Debtor filed a response to the Plaintiffs' motion supported by a brief, numerous exhibits, specific passages from the Debtor's testimony at her Rule 2004 examination, and an affidavit signed by David Findling (Docket #24). The Debtor's brief responds to each of the Plaintiffs' arguments for summary judgment under § 523(a)(2)(A), § 523(a)(6) and § 523(a)(4) of the Bankruptcy Code. A hearing on the Plaintiffs' motion was scheduled for January 16, 2009 but was adjourned for one week to January 23, 2009 because of a conflict in the Court's schedule. After the Court adjourned the hearing on the motion, the Plaintiffs filed a reply to the Debtor's response (Docket #33). The Plaintiffs' reply contains additional exhibits, including numerous email exchanges and one new affidavit from Teisha Tann, which was signed on January 15, 2009.

On January 23, 2009, the Court heard the Plaintiffs' motion. At the conclusion of the hearing, the Debtor's counsel requested that the Debtor be given an opportunity to file a counter affidavit to the Tann affidavit. The Debtor's counsel explained that the Tann affidavit was filed on January 16, 2009, that the Debtor was out of town at the time the affidavit was filed, and that the

Debtor first saw the Tann affidavit on January 20, 2009. The Debtor's counsel further explained that the Debtor had signed a counter affidavit, that it was available in court, and asked for permission to file it. In the interest of fairness, the Court granted that permission in view of the fact that the Tann affidavit had only been filed on January 16, 2009 and would not even have been considered by the Court if the hearing on January 16, 2009 had gone forward as originally scheduled. The Court then took the motion for summary judgment under advisement. On January 27, 2009, the Debtor filed her counter affidavit (Docket #35) but also filed five additional affidavits (Docket #36 - #40), none of which were discussed at the January 23, 2009 hearing. The Debtor did not request permission to file these five additional affidavits. On January 29, 2009, the Plaintiffs filed a motion to strike the Debtor's affidavit and the five additional affidavits. On March 11, 2009, the Court granted the Plaintiffs' motion in part, striking the five additional affidavits but allowing the Debtor's affidavit to remain in the Court file. The Court has considered the Debtor's affidavit, but has disregarded the five stricken affidavits for purposes of the pending summary judgment motion.

### III. Jurisdiction

This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1) and E. D. Mich. LR 83.50(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

### IV. Standard for Summary Judgment

Fed. R. Civ. P. 56(c) for summary judgment is incorporated into Fed. R. Bankr. P. 7056. Summary judgment is only appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not

-11-

defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

"The initial burden is on the moving party to demonstrate that an essential element of the non-moving party's case is lacking." Kalamazoo River Study Group v. Rockwell International Corp., 171 F.3d 1065, 1068 (6th Cir. 1999) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). "The burden then shifts to the non-moving party to come forward with specific facts, supported by evidence in the record, upon which a reasonable jury could return a verdict for the non-moving party." Id. (citing Anderson, 477 U.S. at 248). "The non-moving party, however, must provide more than mere allegations or denials . . . without giving any significant probative evidence to support" its position. Berryman v. Rieger, 150 F.3d 561, 566 (6th Cir. 1998) (citing Anderson, 447 U.S. at 256). "If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate." Braithwaite v. Timken Co., 258 F.3d 488, 493 (6th Cir. 2001) (internal quotation marks and citations omitted).

## V.  Discussion

a.   Section 523(a)(2)(A)

The Plaintiffs argue that the Debtor's debts owing to them are non-dischargeable under several sections of § 523(a). The first of these is § 523(a)(2)(A). Section 523(a)(2)(A) is phrased in the disjunctive. It describes three types of conduct engaged in by a debtor that can give rise to a non-dischargeable debt: (1) false pretenses; (2) a false representation; and (3) actual fraud.

-12-

In their brief, the Plaintiffs argue that the Debtor's debts are non-dischargeable under § 523(a)(2)(A) based on two theories. First, the Plaintiffs argue that the debts to them arise from actual fraud by the Debtor. Second, the Plaintiffs argue that the debts to them arise from the false representations made by the Debtor to the Plaintiffs concerning the payment of their professional fees from the proceeds of her divorce settlement and from her failure to disclose to the Plaintiffs that she received and used the proceeds from the 401(k) and Investment Accounts contrary to the December Letters.

The Court will first address whether the Debtor's debts to the Plaintiffs are non-dischargeable based on actual fraud. The Bankruptcy Appellate Panel for the Sixth Circuit articulated the standard that applies in non-dischargeability cases under § 523(a)(2)(A) premised on actual fraud. In Mellon Bank, N.A. v. Vitanovich (In re Vitanovich), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001), the Bankruptcy Appellate Panel adopted the position of the Seventh Circuit Court of Appeals in McClellan v. Cantrell, 217 F.3d 890 (7th Cir. 2000) that "actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions." In Vitanovich, the court explained that

> [i]n McClellan, the Court of Appeals . . . stated that "section 523(a)(2)(A) is not limited to 'fraudulent misrepresentation.' [B]y distinguishing between 'a false representation' and 'actual fraud,' the statute makes clear that actual fraud is broader than misrepresentation." McClellan acknowledges that many cases have assumed that "'actual fraud' involves a misrepresentation." However, such a restricted definition is not required, **as actual fraud encompasses "any deceit, artifice, trick, or design involving direct or active operation of the mind, used to circumvent and cheat another."**

In re Vitanovich, 259 B.R. at 877 (quoting McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000)) (emphasis added). The Vitanovich court held that "[w]hen a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual

-13-

fraud and is not entitled to the fresh start provided by the Bankruptcy Code." Id.

In this case, the Debtor has admitted in her Rule 2004 examination that: she granted liens to the Plaintiffs on all of the 401(k) proceeds and the Investment Accounts proceeds; she understood that she had granted such liens; she promised to disburse the proceeds to the Plaintiffs in accordance with the December Letters; she instead received the 401(k) proceeds directly and instructed her ex-husband to send the Investment Accounts proceeds directly to her; she then immediately spent the proceeds on her personal bills and credit cards; she knew that these proceeds were subject to the Plaintiffs' liens; she knew that she had allocated 75% of the proceeds to the Plaintiffs in recognition of their lien rights under the December Letters; her conduct was in direct breach of the December Letters; her conduct prevented the Plaintiffs from exercising their lien rights in such proceeds; and she concealed her receipt and disposition of these proceeds from the Plaintiffs. Based upon these admissions alone, the Court finds that the Debtor's conduct constitutes actual fraud. There is no genuine issue of fact that the Debtor intentionally engaged in this conduct to circumvent and cheat the Plaintiffs out of their respective shares of the proceeds of the 401(k) and the Investment Accounts. The fact that the Debtor also now insists that she intended to pay back the Plaintiffs later does not create a genuine issue of material fact as to whether the Debtor's conduct constitutes actual fraud with respect to the 401(k) proceeds and the Investment Accounts proceeds.

Although the Court concludes that there are no genuine issues of material fact regarding the elements of § 523(a)(2)(A) based on actual fraud, the Debtor's conduct that makes up the actual fraud did not create the entire debt owing to the Plaintiffs. Rather, the Debtor's actual fraud only pertained to the proceeds of the 401(k) and the Investment Accounts. The Plaintiffs seem to be arguing that the *entire* debts owing to them are somehow non-dischargeable because of actual fraud

-14-

under § 523(a)(2)(A).  But there is nothing in the Plaintiffs' brief nor in the supporting exhibits or affidavits that can somehow bootstrap the entire balance of the debts owing to the Plaintiffs into a § 523(a)(2)(A) non-dischargeable debt based upon actual fraud.  The Debtor's actual fraud, as shown by the Debtor's admissions described above, occurred *after* the Debtor incurred her debts to the Plaintiffs.  The Debtor's fraudulent conduct prevented the Plaintiffs from enforcing their rights to the proceeds of the 401(k) and the Investment Accounts, but it did not create the entire amount of the debts owing by the Debtor to the Plaintiffs.  Therefore, the Plaintiffs are only entitled to a partial summary judgment representing that portion of the debt created by the actual fraud, with the amount of the partial summary judgment limited to the Plaintiffs' respective 25% shares of the 401(k) proceeds and the Investment Accounts proceeds.  The Plaintiffs' request for summary judgment that the balance of the debts owed to them is non-dischargeable for actual fraud is denied.

The Plaintiffs also argue that the Debtor's entire debts to them are still non-dischargeable under § 523(a)(2)(A) based upon false representations made by the Debtor to them.  The Sixth Circuit has set forth the following requirements in order for a plaintiff to prevail under § 523(a)(2)(A) based on false representation in Rembert v. AT&T Universal Card Services, Inc. (In re Rembert), 141 F.3d 277 (6th Cir. 1998):

> In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements:  (1) the debtor obtained money[, property, services, or credit; (2)] through a material misrepresentation[; (3)] that, at the time, the debtor knew was false or made with gross recklessness as to its truth;  [(4)] the debtor intended to deceive the creditor; [(5)] the creditor justifiably relied on the false representation; and [(6)] its reliance was the proximate cause of loss.  In order to except a debt from discharge, a creditor must prove each of these elements by a preponderance of the evidence.  Further, exceptions to discharge are to be strictly construed against the creditor.

141 F.3d at 280-81 (citations and footnote omitted).

The first element under <u>Rembert</u> is met. Debra N. Ribitwer's affidavit states that the balance owing by the Debtor to Ribitwer is $218,369. Barry P. Lefkowitz's affidavit states that the balance owing to Virchow is $92,464.86. Mayer Morganroth's affidavit states that the balance owing to Morganroth is $258,910.42.

The Debtor's affidavit states in paragraph 15 that "at all times, including in my bankruptcy filings, I disputed the amounts claimed by Morganroth, Ribitwer and Virchow Krause." (Docket #35.) The Debtor's schedule F filed in her bankruptcy case on May 13, 2008 (Case number 08-50331 (Docket #11)), lists the following unsecured debts as non-contingent, liquidated and undisputed:

| | |
|---|---|
| Ribitwer | $ 218,368.87 |
| Morganroth | 263,649.35 |
| Virchow | 101,203.79 |

After the Plaintiffs filed their complaint, the Debtor filed an amended schedule F on October 8, 2008 (Case number 08-50331 (Docket #85)). The Debtor listed the same amounts for the three claims, but indicated each debt was unliquidated and disputed.

The Court finds that the Debtor's affidavit and amended schedule F do not create a genuine issue of material fact. As the non-moving party, the Debtor "must provide more than mere allegations or denials" and instead must provide "significant probative evidence to support" her position. <u>Berryman v. Rieger</u>, 150 F.3d 561, 566 (6th Cir. 1998) (citation omitted). The Debtor's affidavit only contains a conclusory statement with no averment as to why the Debtor disputes the amounts or what the correct amounts should be. The Debtor did not even direct the Court to her amended schedule F as evidence of the amount of the debts or their status as disputed. In her Rule 2004 examination, the Debtor admitted, at least to the debt owed to Morganroth, that the amount

-16-

alleged in the complaint was correct. (Ex. D, Rule 2004 Exam Tr. at 172.) The portions of the transcript provided to the Court do not contain any testimony explaining any basis to dispute the debts owed to Ribitwer and Virchow. The Debtor's belated and unsupported statement in her affidavit that her debts to the Plaintiffs are "disputed" is not sufficient to create a genuine issue of material fact. There is no genuine dispute that the Debtor owes the Plaintiffs debts for services rendered by the Plaintiffs in connection with her divorce proceeding, and that such debts are in the amounts set forth in the Plaintiffs' affidavits.

The second element under <u>Rembert</u> is that there be a material misrepresentation. The Plaintiffs assert that the material misrepresentation in this case consists of the Debtor's statements that she would satisfy her obligations to the Plaintiffs out of the proceeds of her divorce settlement. (Plfs.' Br. at 15 (Docket #17).) The Debtor does not deny that she promised to pay the Plaintiffs for their services, that she agreed to the distribution of proceeds to the Plaintiffs out of her divorce settlement, and that she promised in the December Letters to disburse the 401(k) and the Investment Accounts proceeds to the Plaintiffs. There is no dispute that these statements by the Debtor turned out to be untrue. Therefore, the second element of § 523(a)(2)(A) is present.

The third element under <u>Rembert</u> is that the Debtor knew at the time that she made the misrepresentations that such statements were false or that they were made with gross recklessness as to their truth. The Court finds that there are genuine issues of material fact regarding this element. The exhibits and affidavits submitted by the Plaintiffs and the testimony of the Debtor in her Rule 2004 examination leave open questions regarding the Debtor's knowledge and intent at the time that she promised to pay the Plaintiffs when she first engaged the Plaintiffs to render services, when she was billed for and promised to pay for the services along the way, and when she signed

-17-

the December Letters. There are genuine issues of material fact regarding the knowledge of the Debtor at the times that she made her promises to pay to the Plaintiffs.

The fourth element under <u>Rembert</u> is that the Debtor intended to deceive the Plaintiffs. The Debtor's testimony in her Rule 2004 examination leaves no doubt that the Debtor did intend to deceive the Plaintiff when she received the 401(k) proceeds and the Investment Accounts proceeds in March and April 2008. She admitted that she concealed the fact of her receipt of the proceeds from the Plaintiffs and that she had instructed her ex-husband to have the Investment Accounts proceeds sent directly to her. However, at the time the Debtor made these statements regarding receipt of the proceeds from the 401(k) and from the Investment Accounts, the bulk of the debts to the Plaintiffs had already been incurred. While the Plaintiffs also argue that the Debtor *never* intended to pay their bills from the time that the Debtor first hired the Plaintiffs, the Court cannot conclude from a review of the exhibits, affidavits and the Debtor's Rule 2004 testimony, that the Debtor intended to deceive the Plaintiffs when she signed the retention agreements with each of them promising to pay their bills for services rendered, and when she promised to pay their bills during the time that the Plaintiffs continued to provide services to her. The Court agrees that there is no genuine issue of fact that the Debtor intended to deceive the Plaintiffs when she made the statements regarding her receipt and disposition of the 401(k) and Investment Accounts proceeds. But that all occurred in March and April 2008, *after* the debts had already been incurred by the Debtor. The Court concludes that there are genuine issues of material fact regarding the Debtor's intent when she signed the retention agreements promising to pay the Plaintiffs, when she was billed by the Plaintiffs, and when she signed the December Letters.

The fifth element under <u>Rembert</u> is that the Plaintiffs must have justifiably relied upon the

-18-

Debtor's false representations. The Plaintiffs argue that the justifiable reliance element is satisfied because the Plaintiffs continued to perform services for the Debtor based upon the Debtor's false statements that she would pay the Plaintiffs for their services out of the divorce proceeds. (Plfs.' Br. at 17 (Docket #17).) However, as explained earlier, most if not all of the debts for the outstanding professional fees had already been incurred before the Debtor signed the December Letters and before she made the false statements about her receipt of the 401(k) proceeds and Investment Accounts proceeds in March and April, 2008. Nowhere do the Plaintiffs state that they continued to render services for the Debtor *after* December, 2007, in reliance upon the statements she made in the December Letters. Nor do the Plaintiffs allege that they continued to render services for the Debtor *after* the Debtor made the false statements in March, 2008. It appears from a review of the exhibits that the Debtor's divorce action was complete with the entry of the Judgment on November 20, 2007, and all that remained was for the Debtor to pay the Plaintiffs. While the Court agrees that the evidence shows that the Debtor made false statements to the Plaintiffs in March, 2008, and may possibly also have made false statements to the Plaintiffs in December, 2007, there is no evidence in the record to show that the Plaintiffs justifiably relied upon any of those statements to continue to thereafter render services and extend credit. The debts had already been incurred by the date of those statements. Therefore, the Court concludes that there are genuine issues of material fact regarding the fifth element of justifiable reliance on the Debtor's alleged false representations.

The sixth element under <u>Rembert</u> is that the Plaintiffs' reliance was the proximate cause of its loss. Because the Court has already found that there remain genuine issues of material fact as to whether the Plaintiffs did justifiably rely upon any false representations, it necessarily follows that there are also genuine issues of material fact regarding whether any such reliance was the proximate

cause of loss.

In sum, the Court concludes that the Plaintiffs are entitled to a partial summary judgment under § 523(a)(2)(A) based upon actual fraud committed by the Debtor. That partial summary judgment is limited to an amount equal to each of the Plaintiffs' respective shares of the 401(k) proceeds and the Investment Accounts proceeds. The Debtor's conduct constitutes actual fraud and the Court finds that this actual fraud prevented the Plaintiffs from receiving their respective shares of the proceeds of the 401(k) and the Investment Accounts. However, the Court finds that there are genuine issues of material fact with respect to the Plaintiffs' theory that the entire balances owing to them are non-dischargeable based upon actual fraud, and also finds that there are genuine issues of material fact with respect to the Plaintiffs' theory that the entire debts owing to them are non-dischargeable under § 523(a)(2)(A) because of false representations made by the Debtor to them regarding payment of the debts incurred by the Debtor with the Plaintiffs.

b.     Section 523(a)(6)

The Plaintiffs next assert that the Debtor's debts to them are non-dischargeable under § 523(a)(6). Section 523(a)(6) excepts from discharge any debt for a "willful and malicious injury by the debtor to another entity or to the property of another entity." The elements of non-dischargeability under § 523(a)(6) are (i) desire to cause the consequences of the act or belief that the consequences are substantially certain to result (willful); and (ii) no just cause or excuse (malicious). Kennedy v. Mustaine (In re Kennedy), 249 F.3d 576, 580 (6th Cir. 2001) (citations omitted).

Non-dischargeability of a debt under § 523(a)(6) "takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61,

(1998). The Sixth Circuit Court of Appeals broadened this holding, relying on the <u>Geiger</u> court's reference to the Restatement (Second) of Torts § 8A, to hold "that unless 'the actor desires to cause the consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." <u>Markowitz v. Campbell</u> (<u>In re Markowitz</u>), 190 F.3d 455, 464 (6th Cir. 1999) (quoting Restatement (Second) of Torts § 8A, at 15 (1964)). Generally, actions under § 523(a)(6) look for an intentional tort as the basis for the debt. <u>See</u> <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61 (1998) ("[T]he [523](a)(6) formulation triggers in the lawyer's mind the category of 'intentional torts,' as distinguished from negligent or reckless torts.") (citation omitted).

The Plaintiffs argue that their entire debts are non-dischargeable under § 523(a)(6). In support, they primarily emphasize the Debtor's failure to comply with the December Letters, which they characterize as an act of conversion of the 401(k) proceeds and the Investment Accounts proceeds. The Debtor argues that her conduct does not constitute a willful and malicious injury under § 523(a)(6) because, at most, the Debtor has only breached the contractual obligations that she had to pay the Plaintiffs what she owed them, and to distribute proceeds out of the 401(k) and the Investment Accounts pursuant to the December Letters.

In <u>Davis v. Aetna Acceptance Co.</u>, 293 U.S. 328 (1934), the U.S. Supreme Court interpreted the statutory language of then § 17(2) of the Bankruptcy Act, which is now § 523(a)(6), and explained "that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception." <u>Id.</u> at 332. The Court gave an example "where the wrong was unexcused and wanton." <u>Id.</u> (citing <u>McIntyre v. Kavanaugh</u>, 242 U.S. 138 (1916)). The Court went on to explain that

> a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

Id. (citations omitted). With reliance on Davis v. Aetna, the Supreme Court made clear in Geiger "that not every tort judgment for conversion is exempt from discharge. Negligent or reckless acts . . . do not suffice to establish that a resulting injury is 'wilful and malicious.'" Kawaauhau v. Geiger, 523 U.S. at 63-64 (citation omitted).

> In considering a case involving conversion of collateral, one court observed that

> the true injury is not that the creditor's debt goes unpaid. The true injury is that the creditor's collateral was wrongly or improperly disposed of and that the proceeds were used for purposes other than payment of the obligation that property secured. Consequently, the proper question is not whether the debtor intended that its secured creditor would go unpaid. Instead, the question to ask is whether the debtor intended to improperly use the creditor's collateral and/or its proceeds for purposes other than the payment of the debt that property secured. If so, there is an intentional injury.

Dominion Virginia Power v. Robinson (In re Robinson), 340 B.R. 316, 336 (Bankr. E.D. Va. 2006) (citation omitted).

> In an unpublished opinion, the Sixth Circuit has also observed that a willful and malicious injury can be based upon conversion.

> [A]n "injury" under section 523(a)(6) must constitute an invasion of the creditor's legal rights. Thus, it was appropriate to inquire whether the [debtor] violated [the plaintiff's] rights by paying other creditors. If [the plaintiff] were a secured creditor, using secured assets (or the proceeds from selling such assets) to pay unsecured creditors could have invaded his rights.

Steier v. Best (In re Best), 109 Fed.Appx. 1, No. 03-5098, 2004 WL 1544066 at *8-9 (6th Cir. June 30, 2004) (citation omitted).

> The Bankruptcy Code does not define conversion. Under Michigan common law,

conversion is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein. In general, it is viewed as an intentional tort in the sense that the converter's actions are wilful, although the tort can be committed unwittingly if [the defendant is] unaware of the plaintiff's outstanding property interest.

Foremost Ins. Co. v. Allstate Ins. Co., 486 N.W.2d 600, 606 (Mich. 1992) (citations omitted).

The starting point to determine whether an act of conversion occurred in this case requires an understanding of what property interest, if any, the Plaintiffs had in the 401(k) proceeds and the Investment Accounts proceeds. The December 10, 2007 letter appears to recognize that the 401(k) proceeds and the Investment Accounts proceeds are the Debtor's property. The opening paragraph of the letter, which is addressed to the Debtor, refers to "your share" of the proceeds from the 401(k) and the Investment Accounts. The December 10, 2007 letter goes on to explain that the Plaintiffs are each "proper and appropriate lien holders" in such proceeds but does not state that the Plaintiffs have an ownership interest in such proceeds. Similarly, the December 11, 2007 letter describes the Plaintiffs as "proper and appropriate lien holders" with respect to such proceeds as opposed to owners of the proceeds. Finally, the December 13, 2007 letter again refers to the Plaintiffs as "proper and appropriate lien holders" with respect to the proceeds rather than the owners of the proceeds. These statements in the December Letters are consistent with the Settlement Agreement, the Judgment, the Attorney Lien and the Notice of Charging Lien, all of which also treat the proceeds as owned by the Debtor subject to the liens granted by those documents. The Court finds that there is no genuine issue of material fact regarding the ownership of the proceeds from the 401(k) and the Investment Accounts: the proceeds were owned by the Debtor, not the Plaintiffs.[2]

_____

[2] The Court notes that a possible interpretation of the December Letters is that they manifest the Debtor's intent to assign her ownership interest of 75% of the 401(k) and Investment Accounts proceeds to the Plaintiffs. See Burkhardt v. Bailey, 680 N.W.2d 453, 463

-23-

The issue then is what precisely were the interests of Ribitwer, Virchow and Morganroth in the 401(k) proceeds and the Investment Accounts proceeds in this case?

Ribitwer and Morganroth are attorneys. Virchow is not. That is important because, even absent a security agreement, Michigan law confers certain lien rights upon attorneys with respect to a fund that results from the services of the attorney.

> In Michigan, the law creates a lien of an attorney upon the judgment or fund resulting from his or her services.
>  . . . .
> An attorney's lien is not an assignment but is a specific encumbrance on a fund or judgment which the client has recovered through the professional services of the attorney.

Aetna Casualty & Surety Co. v. Starkey, 323 N.W.2d 325, 327-28 (Mich. Ct. App. 1982).

However, in addition to the charging liens granted by Michigan law to Ribitwer and Morganroth, the Plaintiffs also assert that the Debtor agreed to grant each of the Plaintiffs a lien on any assets awarded to her as part of her divorce settlement to secure payment of the fees owing by her to the Plaintiffs. To support their argument, the Plaintiffs point to the Settlement Agreement and Judgment, both of which contain provisions whereby the Debtor granted consensual liens on all of the real and personal property awarded to her as part of the divorce settlement. The problem with this argument is that the provisions in both the Settlement Agreement and the Judgment expressly grant such liens only to the "parties' respective attorneys . . . to secure the payment of attorney fees, costs and expenses . . . due each attorney . . . ." The Settlement Agreement and the Judgment do

---

(Mich. Ct. App. 2004) (explaining that under Michigan law, "a written instrument, even if poorly drafted, creates an assignment if it clearly reflects the intent of the assignor to presently transfer 'the thing' to the assignee"). The Plaintiffs, however, do not contend that the December Letters assigned ownership of the 401(k) proceeds and the Investment Accounts proceeds to them. Instead, they assert that their interest consists of a lien or security interest in those proceeds.

not mention Virchow. There is no provision in Virchow's retention agreement with the Debtor, the Settlement Agreement, or the Judgment, that grants Virchow a lien on the Debtor's share of the divorce settlement to secure payment of the outstanding balance due and owing for professional services rendered. Therefore, while Ribitwer and Morganroth hold both a charging lien and a consensual security interest in the Debtor's recovery in the divorce action, including the 401(k) proceeds and the Investment Accounts proceeds, it does not appear that Virchow holds any lien, consensual or otherwise, upon any of the Debtor's assets to secure payment of its fees.

Curiously, despite the absence of any lien held by Virchow, the Debtor expressly acknowledged and recognized in the December Letters that Virchow was a "proper and appropriate lien holder." However, in opposing the Plaintiffs' summary judgment motion, the Debtor now denies the existence of Virchow's lien. In support, the Debtor contends that she never granted a lien to Virchow under the Settlement Agreement or Judgment despite her statements in the December Letters.

The Court finds that there is no genuine issue of material fact with respect to the property interests of Ribitwer and Morganroth: they each held both a charging lien under Michigan law and a consensual lien under the Settlement Agreement and the Judgment. However, the Court also finds that there is a genuine issue of material fact regarding what property interest, if any, Virchow may have had in any of the Debtor's assets, including the 401(k) and the Investment Accounts proceeds.

The lien rights of Ribitwer and Morganroth on all of the proceeds of the 401(k) and the Investment Accounts are property interests. See United States v. Security Industrial Bank, 459 U.S. 70, 76 (1982) ("The 'bundle of rights' which accrues to a secured party is obviously smaller than that which accrues to an owner in fee simple, but . . . [such] differences [do not] relegate the secured

party's interest to something less than property."). There is no genuine issue of fact that the Debtor disbursed those proceeds in a manner inconsistent with the lien rights of Ribitwer and Morganroth. The Debtor's conduct constitutes conversion. The next issue then is whether this act of conversion created a non-dischargeable debt to Ribitwer and Morganroth under § 523(a)(6).

The Debtor's own testimony in this case overwhelmingly demonstrates the willfulness of the injury she caused to Ribitwer and Morganroth by her conversion of the 401(k) proceeds and the Investment Accounts proceeds. The Debtor admitted in her Rule 2004 examination that she knew that the Plaintiffs claimed liens upon the 401(k) proceeds and the Investment Accounts proceeds; that she understood that she had granted liens to the Plaintiffs; that the liens entitled the Plaintiffs to receive all of the proceeds of the 401(k) and the Investment Accounts; that the Debtor received and spent the proceeds without paying the Plaintiffs their respective shares under the December Letters; and that she lied about these facts to the Plaintiffs. These uncontroverted facts demonstrate that the Debtor's act of conversion was done willfully. There is no genuine issue of fact regarding the Debtor's intentions.

However, liability under § 523(a)(6) only exists if the injury caused by the Debtor to Ribitwer and Morganroth or their property was "malicious." "Malice" for purposes of § 523(a)(6), was defined by the Supreme Court in <u>Tinker v. Colwell</u>, 193 U.S. 473 (1904), as "a wrongful act, done intentionally, without just cause or excuse." 193 U.S. at 485-86 (interpreting analogous § 17(a)(2) of the former Bankruptcy Act) (internal quotation marks and citation omitted). Alternately, malice has been defined as acting "in conscious disregard of one's duties . . . ." <u>Qui v. Zhou</u> (<u>In re Zhou</u>), 331 B.R. 274, 276 (Bankr. E.D. Mich. 2005) (citing <u>Gonzalez v. Moffitt</u> (<u>In re Moffitt</u>), 252 B.R. 916, 923 (B.A.P. 6th Cir. 2000) and <u>Monsanto Co. v. Trantham</u> (<u>In re Trantham</u>), 304 B.R. 298,

308 (B.A.P. 6th Cir. 2004)). Malice "does not require ill-will or specific intent to do harm." Wheeler v. Laudani, 783 F.2d 610, 615 (6th Cir. 1986) (citations omitted).

In this case, the Debtor consciously and deliberately disregarded her duties under the December Letters. The Debtor's only excuse for her conduct is that she needed the proceeds to pay her own personal bills and that she intended to subsequently repay the Plaintiffs. That is not just cause or excuse for her wrongful conduct. See Ford Motor Credit Co. v. Klix (In re Klix), 23 B.R. 187, 190-91 (Bankr. E.D. Mich. 1982) (finding the debtor knew his actions would harm the secured lender based on his experience in business, his concealment of the sale of the collateral, his admission that he understood his obligations under the security agreement, his concession that he falsified forms relating to payments for the collateral, and concluding that "he knew that his act of conversion was in contravention of the rights of Ford Credit, and he proceeded deliberately and intentionally in the face of that knowledge" and thus the debt was non-dischargeable under § 523(a)(6)). There is no genuine issue of material fact regarding the Debtor's malice. Therefore, Ribitwer and Morganroth are each entitled to a partial summary judgment under § 523(a)(6) in the amount of their respective 25% shares of the 401(k) proceeds and the Investment Accounts proceeds.

As noted, only Ribitwer and Morganroth actually held a property interest in the 401(k) proceeds and the Investment Accounts proceeds through their charging liens and the consensual liens granted by the Debtor to them under the Settlement Agreement and Judgment. As a result, the § 523(a)(6) finding based on conversion applies only to them, and not to Virchow. However, there is another independent basis for finding that Virchow, as well as Ribitwer and Morganroth, is entitled to a non-dischargeable debt under § 523(a)(6). This theory does not depend upon a finding

-27-

of conversion, but instead is based upon a finding that a debtor intentionally tried to financially injure a creditor by a deliberate breach of a contract.

The Debtor is correct that generally, a breach of a contract without more is insufficient to constitute a willful and malicious injury. See Kawaauhau v. Geiger, 523 U.S. 57, 62 (rejecting an interpretation of willful and malicious injury under § 523(a)(6) that would include a broad range of acts intentionally engaged in, but where the consequences of the acts were unintended, for example, a "knowing breach of contract"). A debtor's simple breach of a contract ordinarily will not be sufficient for the damages resulting from such breach to be deemed to be a non-dischargeable debt under § 523(a)(6). Salem Bend Condominium Assoc. v. Bullock-Williams (In re Bullock-Williams), 220 B.R. 345, 347 (B.A.P. 6th Cir. 1998) (finding that creditor did not demonstrate that debtor intended to cause harm by failing to pay condominium association dues). However, there are cases that have held that a breach of contract, plus aggravating circumstances, may give rise to a non-dischargeable debt under § 523(a)(6).

In The Spring Works, Inc. v. Sarff (In re Sarff), 242 B.R. 620, 626 (B.A.P. 6th Cir. 2000), the Bankruptcy Appellate Panel recognized that "damages for a breach of contract can be a non-dischargeable debt under § 523(a)(6)." The Sarff panel noted that under Geiger, a "plaintiff must [ ] show more than just a 'knowing breach of contract' and must prove that the [debtor] 'intended to cause harm by' breaching the contract." Id. (citation omitted). Another court has reasoned that

> "An ordinary tort or breach of contractual or statutory duty generally is not sufficient to deny discharge [of a debt] under subsection [(a)](6) without some aggravating circumstance evidencing conduct so reprehensible as to warrant denial of the 'fresh start' to which the 'honest but unfortunate' debtor would normally be entitled under the Bankruptcy Code."

Id. at 626 (quoting Novartis Corp. v. Luppino (In re Luppino), 221 B.R. 693, 700 (Bankr. S.D.N.Y.

-28-

1998)).

In <u>Sarff</u>, the debtor's former employer sought a determination that the damages awarded to it and against the debtor under a state court judgment were non-dischargeable debts under § 523(a)(6). <u>Id.</u> at 623. The employer obtained a state court judgment based on the debtor's breach of a non-compete agreement, interference with business relationships, misappropriation of trade secrets and breach of the duty of loyalty. <u>Id.</u> at 625. The bankruptcy appellate panel determined that the debt was non-dischargeable under § 523(a)(6). The extensive findings of the state court supported a holding that the debtor had engaged in actions that constituted a "willful and deliberate breach of his contract of service" and an "intention to cause [his employer] economic injury." <u>Id.</u> at 628; <u>see also</u> <u>Monsanto Co. v. Trantham</u> (<u>In re Trantham</u>), 304 B.R. 298 (B.A.P. 6th Cir. 2004) (failure to pay licensing fees coupled with concealing identity to avoid detection and an admission of an intent to cause economic harm was sufficient to find debt to be non-dischargeable under § 523(a)(6)).

The Debtor's actions in this case, like <u>Sarff</u>, evidence a willful and deliberate breach of a contract accompanied by aggravating circumstances. The December Letters were an accommodation by the Plaintiffs to the Debtor, at her request. But for those letters, Ribitwer and Morganroth were entitled to take all of the proceeds. Each of the December Letters recognized that fact by stating the Debtor's belief that all of the Plaintiffs, including Virchow, "are proper and appropriate lien holders" with respect to the 401(k) proceeds and the Investment Accounts proceeds. Although the Debtor now denies that Virchow held a lien upon the proceeds, the Debtor does not deny that she signed the December Letters, nor that she testified that she believed that all of the Plaintiffs were lien holders when she signed those letters. The point is that the Debtor believed that

-29-

Virchow, just like Ribitwer and Morganroth, held a property interest in the proceeds. The Debtor obtained, used and then concealed her use of the 401(k) proceeds and Investment Accounts proceeds from the Plaintiffs in complete disregard of the Plaintiffs' interests in the proceeds in contravention of the December Letters. Although technically not conversion as to Virchow, because Virchow did not actually hold a lien, the Debtor nonetheless clearly intended to injure Virchow, as well as Ribitwer and Morganroth, by appropriating proceeds that she believed to be subject to liens held by *all* of the Plaintiffs, including Virchow. At a minimum, the Debtor knew that the consequences of her actions were substantially certain to harm all of the Plaintiffs.

This is not a simple breach of contract. A simple breach of contract occurred when the Debtor did not pay the Plaintiffs for their services when she was billed for those services. But the Debtor's appropriation of the 401(k) proceeds and the Investment Accounts proceeds was done for the express purpose of preventing the Plaintiffs from enforcing what the Debtor believed to be their lien rights in those proceeds. Obtaining the accommodation in the December Letters and then misappropriating the proceeds are aggravating circumstances that elevate the Debtor's conduct beyond a simple breach of contract. The Court finds that there are no genuine issues of material fact and that all of the Plaintiffs are entitled to a non-dischargeable debt under § 523(a)(6) because of the Debtor's intention to injure all of the Plaintiffs by appropriating for herself the 401(k) proceeds and the Investment Accounts proceeds.

However, much like their approach to § 523(a)(2)(A), the Plaintiffs appear to be arguing that the *entire* debts to them are somehow non-dischargeable under § 523(a)(6), not just the amount of the proceeds from the 401(k) and the Investment Accounts. Even though the Court agrees with the Plaintiffs that the Debtor's conduct in appropriating the 401(k) proceeds and the Investment

Accounts proceeds was willful and malicious for purposes of § 523(a)(6), that conduct did not occur until March, 2008. The Plaintiffs do not explain how the Debtor's conduct in receiving the 401(k) proceeds and the Investment Accounts proceeds, concealing those proceeds from the Plaintiffs, and spending those proceeds to pay personal bills, can somehow make *all* of the outstanding balances owing by the Debtor to the Plaintiffs non-dischargeable. The only debts that were arguably created by the Debtor's willful and malicious conduct consist of the amounts of the 401(k) proceeds and Investment Accounts proceeds that the Debtor was required to pay over to the Plaintiffs under the December Letters. The balance of the debts owing to the Plaintiffs was not created by that conduct. Even if the Debtor had properly disbursed the respective 25% shares out of those proceeds to each of the Plaintiffs, the Plaintiffs would still have substantial unpaid balances owing to them. The Court finds that the Plaintiffs are not entitled to summary judgment under § 523(a)(6) with respect to any of the debts owing to them in excess of the amounts of the 401(k) proceeds and Investment Accounts proceeds received by the Debtor that the Debtor concealed from the Plaintiffs and then used to pay her personal bills.

c.      Section 523(a)(4)

The Plaintiffs also argue that the debts owed to them are non-dischargeable under § 523(a)(4) of the Bankruptcy Code. Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Before examining the elements necessary to a finding of non-dischargeability under § 523(a)(4), there is a procedural point that first needs to be addressed. The Plaintiffs' motion requests summary judgment under §§ 523(a)(2)(A), (a)(4) and (a)(6) of the Bankruptcy Code. The Plaintiffs' complaint seeks a judgment under §§ 523(a)(2)(A) and (a)(6), but does not plead a cause of action under § 523(a)(4). Notwithstanding

this fact, Plaintiffs' motion and brief in support contain an extended discussion regarding the application of § 523(a)(4) and why the Plaintiffs believe that the debts owed to them are non-dischargeable under that section of the Bankruptcy Code.

In her brief in response to the Plaintiffs' motion, the Debtor does not object to the Plaintiffs requesting summary judgment under § 523(a)(4). Instead, the Debtor responds to the substantive arguments made by the Plaintiffs to support their § 523(a)(4) claim. At the hearing on the Plaintiffs' motion, Plaintiffs' counsel also addressed in oral argument the Plaintiffs' request for relief under § 523(a)(4) and the Debtor's counsel responded to those arguments. The Debtor's counsel did object at the hearing to what he described as a new argument being raised under § 523(a)(4) by Plaintiffs' counsel during the hearing, but that was not pled in the Plaintiffs' complaint or addressed in the Plaintiffs' brief in support of their motion. That argument pertained to whether the relationship created between the Debtor and the Plaintiffs by the December Letters somehow constitutes a fiduciary relationship for purposes of § 523(a)(4). However, the Debtor's counsel did not object to the Court considering the written § 523(a)(4) arguments made in the Plaintiffs' brief nor to the § 523(a)(4) oral arguments made at the hearing based upon theories of embezzlement or larceny. Instead, the Debtor only requested that, if the Court was inclined to consider the Plaintiffs' oral argument that a fiduciary relationship was created for purposes of § 523(a)(4), then the Debtor should be given an opportunity to file a supplemental brief responding to this argument. Before tackling any of the elements of § 523(a)(4) under any of these various theories, the Court must first resolve whether to consider at all the Plaintiffs' § 523(a)(4) arguments in light of the fact that they are not set forth in the Plaintiffs' complaint.

One alternative for the Court is to not consider any § 523(a)(4) arguments as Plaintiffs'

complaint did not seek relief under § 523(a)(4). The difficulty with this alternative is that the Plaintiffs and the Debtor have both already argued the substantive issues regarding the application of this section of the Bankruptcy Code in this case, and appear to have either expressly or impliedly agreed to have the Court rule upon their arguments. If the Court does not now consider § 523(a)(4), it seems likely, indeed inevitable, that the Plaintiffs will then seek leave to amend their complaint to add a § 523(a)(4) count. In view of the fact that this adversary proceeding is not set for trial until August 12, 2009, and because Fed. R. Civ. P. 15(a)(2) (incorporated by Fed. R. Bankr. P. 7015), provides that the Court should "freely give leave to amend when justice so requires," there exists a high probability that the Court would grant such leave. After granting such leave, the Court would undoubtedly soon have before it another request by the Plaintiffs for summary judgment. In these circumstances, deferring consideration of the § 523(a)(4) issues already briefed and argued is inconsistent with judicial economy and with the parties' desire to resolve issues expeditiously and economically.

Another alternative is for the Court to consider the § 523(a)(4) issues right now. In this case, the pleadings filed by the parties and the oral argument record at the hearing on January 23, 2009 persuade the Court that the Plaintiffs and the Debtor expressly consented to have the Court rule on the Plaintiffs' § 523(a)(4) request for relief and the Debtor's opposition to that request. Therefore, the Court will treat the § 523(a)(4) request for relief by the Plaintiffs in all respects as if it had been raised in the complaint and will consider all of the arguments advanced in the Plaintiffs' brief in support of the motion for summary judgment and the Debtor's brief in opposition to the motion for summary judgment.

Beginning on page ten of the Plaintiffs' brief, the Plaintiffs argue that the Debtor's debts to

them are non-dischargeable under § 523(a)(4) based upon three different theories. First, they argue that the debts are for fraud or defalcation while acting in a fiduciary capacity. Second, they argue that the debts are for larceny. Third, they argue that the debts are for embezzlement. The Court will address each of these theories under § 523(a)(4) in sequence.

The most recent statement by the Sixth Circuit Court of Appeals regarding defalcation while acting in a fiduciary capacity is Board of Trustees of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci), 493 F.3d 635 (6th Cir. 2007). In that case, the court explained the meaning of the phrase "defalcation while acting in a fiduciary capacity":

> A debt is non-dischargeable as a defalcation when the preponderance of the evidence establishes: (1) a preexisting fiduciary relationship; (2) breach of that fiduciary relationship; and (3) a resulting loss.
>
> The Sixth Circuit construes the term "fiduciary capacity" found in the defalcation provision of § 523(a)(4) more narrowly than the term is used in other circumstances. [In prior cases, the Court has] limited the application of the defalcation provision to express or technical trusts and refused to extend it to constructive or implied trusts imposed by operation of law as a matter of equity. The decisions in those cases relied on the Supreme Court's holding in Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934), that the defalcation provision applies only to express or technical trusts. . . . [The Sixth Circuit] adopted a narrow definition of the defalcation provision and held that it does not apply to someone who merely fails to meet an obligation under a common law fiduciary relationship. Accordingly, the defalcation provision applies to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor.
>
> To establish the existence of an express or technical trust, a creditor must demonstrate: (1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary.

In re Bucci, 493 F.3d at 639-40 (internal quotation marks and citations omitted).

In their brief, the Plaintiffs do not clearly indicate what fiduciary relationship they believe may have existed with the Debtor. At the oral argument on January 23, 2009, counsel for the

Plaintiffs indicated that the December Letters created a fiduciary relationship with the Plaintiffs. Although the Debtor's counsel objected at the hearing to the Plaintiffs asserting the existence of a fiduciary relationship based on the December Letters, and requested the opportunity to file a supplemental brief on this issue, the Court concludes that there is no need for a supplemental brief because the Plaintiffs have not shown that there was a fiduciary relationship between the Debtor and the Plaintiffs for purposes of § 523(a)(4).

As explained by the Sixth Circuit in <u>Bucci</u>, the Plaintiffs must demonstrate the existence of an express or technical trust. The Plaintiffs have not shown that the elements of an express or technical trust, including an intent to create a trust, a trustee, a trust res, and a definite beneficiary, are present in this case. Rather, it appears from the exhibits filed by the Plaintiffs in support of their motion, that the Plaintiffs assert the existence of a trust based upon the Debtor's receipt of the proceeds from the 401(k) and the Investment Accounts, her failure to disburse those proceeds in accordance with the December Letters, and her concealment of those facts from the Plaintiffs. Those facts do not support a finding of an express trust but, at most, may support the finding of a trust *ex maleficio*. Trusts *ex maleficio* arise upon an act of wrongdoing and are imposed even where there is no fiduciary relationship before the act of wrongdoing occurs. Such trusts are insufficient to establish a fiduciary relationship under § 523(a)(4) as a matter of law under <u>Davis v. Aetna</u>, 293 U.S. at 333. In this case, the Plaintiffs do not argue that the Debtor was a trustee of the 401(k) proceeds and the Investment Accounts proceeds. The Plaintiffs instead appear to assert that the Debtor's receipt and disbursement of the 401(k) proceeds and the Investment Accounts proceeds constitute wrongful conduct that gives rise to a trust. As explained in <u>Bucci</u>, "the requisite trust relationship must exist prior to the act creating the debt and without reference to it." <u>In re Bucci</u>,

-35-

493 F.3d at 642 (internal quotation marks and citations omitted).

Nor does the fact that the Debtor had a contractual obligation under the December Letters to pay the Plaintiffs their identified percentage of the proceeds from the 401(k) and the Investment Accounts create an express trust for purposes of § 523(a)(4).

> The key point for bankruptcy purposes, however, is that [the debtor] had only a *contractual* obligation to pay the employer contributions. That is not enough, for the debtor must hold funds in trust for a third party to satisfy the fiduciary relationship element of the defalcation provision of § 523(a)(4).

In re Bucci, 493 F.3d at 643 (internal quotation marks and citation omitted).

The Plaintiffs' brief in support of their motion does not contend that the December Letters created an express trust under Michigan law. Nor do the Plaintiffs otherwise explain how the relationship created by the December Letters constitutes a fiduciary relationship under federal law for purposes of § 523(a)(4). Therefore, to the extent that the Plaintiffs' request for summary judgment under § 523(a)(4) is based on the assertion of the existence of a fiduciary relationship, the Court concludes that such request must be denied for lack of an express trust.

Even if a fiduciary relationship has not been shown, as noted above, a debt can still be non-dischargeable under § 523(a)(4) if it is a debt for embezzlement or larceny. Williams v. Noblit, (In re Noblit), 327 B.R. 307, 311 (Bankr. E.D. Mich. 2005) (explaining that fiduciary capacity is not an element of embezzlement or larceny under § 523(a)(4)). In their brief, the Plaintiffs contend that the debts owed to them are non-dischargeable based on embezzlement or larceny. The Sixth Circuit Court of Appeals has explained the elements of embezzlement under § 523(a)(4) as follows:

> Federal law defines "embezzlement" under § 523(a)(4) as the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come. A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud.

-36-

Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172-73 (6th Cir. 1996) (internal quotation marks and citation omitted).

In General Motors Acceptance Corporation v. Cline, No. 4:07cv2576, 2008 WL 2740777 (N.D. Ohio, July 3, 2008), the Court explained what larceny is:

> [L]arceny can be defined as the actual or constructive taking away of property of another without the consent and against the will of the owner or possessor with the intent to convert the property to the use of someone other than the owner. Larceny for purposes of § 523(a)(4) requires proof that the debtor wrongfully and with fraudulent intent took property from its rightful owner. As distinguished from embezzlement, the original taking of the property must be unlawful. Larceny is commonly understood to be synonymous with theft. For example, larceny occurs when a thief breaks into a home and steals jewelry for the purpose of converting it to cash for his/her own use.

Id. at *4 (citations omitted).

In In re Noblit, the court noted the distinction between larceny and embezzlement.

> Larceny is different in that the original taking must have been unlawful, and is defined as the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner.

327 B.R. at 311 (citation omitted).

The Debtor's conduct in disposing of those proceeds was undoubtedly contrary to the lien rights of Ribitwer and Morganroth, and contrary to the December Letters. However, it was not larceny. First, the Debtor, not the Plaintiffs, owned the 401(k) proceeds and the Investment Accounts proceeds. None of the larceny cases cited to the Court involved property owned by the debtor. Second, the Debtor did not unlawfully take the 401(k) proceeds or the Investment Accounts proceeds. She was entitled to those proceeds under the Settlement Agreement and Judgment. Therefore, the Plaintiffs' request for summary judgment under § 523(a)(4) based on larceny must

-37-

be denied.

The analysis is a little bit more complicated with respect to whether the Debtor's conduct constitutes embezzlement. As explained by the <u>Brady</u> court, embezzlement exists where there is a "fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." <u>In re Brady</u>, 101 F.3d 1165, 1172-73 (6th Cir. 1996) (internal quotation marks and citations omitted). Disagreement exists in the case law as to whether a debtor's misappropriation of the debtor's own property subject to a security interest may constitute embezzlement under § 523(a)(4).

Several courts have held that a debtor's use of property contrary to a secured creditor's interest in the property is sufficient for a finding of non-dischargeability on embezzlement grounds under § 523(a)(4). Under these cases, an expansive construction of the term "property" is used to encompass interests in property beyond an ownership interest in the property. <u>See</u> <u>General Motors Acceptance Corp. v. Cline</u>, No. 4:07cv2576, 2008 WL 2740777 (N.D. Ohio, July 3, 2008) (finding that debtor committed embezzlement when he used property contrary to terms of security agreement by failing to first pay amounts owed to creditor); <u>Jones v. Hall</u> (<u>In re Hall</u>), 295 B.R. 877, 882 (Bankr. W.D. Ark. 2003) (collecting cases and finding the debtor's conversion of proceeds from creditor's collateral may constitute embezzlement); <u>National City Bank, Marion v. Imbody</u> (<u>In re Imbody</u>), 104 B.R. 830, 841-42 (Bankr. N.D. Ohio 1989) (finding that debtors' use of proceeds from sale of crops with knowledge that such proceeds were subject to the bank's security interest constituted embezzlement under § 523(a)(4)); <u>National Bank of Commerce of Pine Bluff v. Hoffman</u> (<u>In re Hoffman</u>), 70 B.R. 155, 163-64 (Bankr. W.D. Ark. 1986) (citing cases as "substantial authority" to support a finding that an experienced attorney embezzled the proceeds of a secured

-38-

creditor's collateral).

In contrast to these decisions, some courts narrowly construe the term "property" to require that a creditor show that the property allegedly embezzled by a debtor was property actually owned by the creditor. For these courts, the property appropriated must be entirely owned by another, and not property that a debtor owns subject to a creditor's security interest. See First National Bank of Fayetteville, Arkansas v. Phillips (In re Phillips), 882 F.2d 302 (8th Cir. 1989) (concluding that no embezzlement occurred because the debtor owned the funds from the check subject to the creditor's security interest and the creditor's security interest did not give it an absolute ownership interest in the funds or defeat the debtor's interest in the funds); Trane Federal Credit Union v. Conder (In re Conder), 196 B.R. 104, 111 (Bankr. W.D. Wis. 1995) (explaining that a security interest is insufficient to support a finding of embezzlement because "embezzlement involves the appropriation of property *belonging to another person or entity*" therefore, "one cannot embezzle one's own property") (citations omitted); see also Oak Street Funding LLC v. Brown, (In re Brown), 399 B.R. 44, 47-48 (Bankr. N.D. Ind. 2008) (concluding that "a debtor that misappropriates a creditor's collateral, and uses it for purposes other than repaying the creditor's loan, does not steal or embezzle that property"); Everwed Co. v. Ayers (In re Ayers), 25 B.R. 762, 774 (Bankr. M.D. Tenn. 1982) (interpreting the terms embezzlement and larceny used in § 523(a)(4) to "refer to tangible property rather than to intangible property interests" and concluding that a debtor did not commit embezzlement when he sold a vehicle subject to a bank's lien and then used the sale proceeds to purchase inventory for his business instead of remitting payment to the bank).

After reviewing the varying lines of embezzlement cases, the Court concludes that the better reasoned cases are those that hold that embezzlement for § 523(a)(4) purposes only exists where the

property in question was owned by another, and not by the debtor. The proceeds of the 401(k) and the Investment Accounts in this case were owned by the Debtor. The Debtor was entitled to ownership of those proceeds under the Settlement Agreement and the Judgment. This is not a case where the Plaintiffs entrusted *their* property to the Debtor. Nor is it a case where the Plaintiffs' property somehow lawfully came into possession of the Debtor. The Court has already found that the Debtor's conduct in disposing of the 401(k) proceeds and the Investment Accounts proceeds was fraudulent, willful and malicious, giving rise to a non-dischargeable debt both under § 523(a)(2)(A) and § 523(a)(6). But the Court cannot find that the Debtor's conduct constitutes embezzlement for purposes of § 523(a)(4) because the proceeds in question were owned by the Debtor, and not by the Plaintiffs. Accordingly, the Plaintiffs' motion for summary judgment under § 523(a)(4) based on fraud or defalcation while acting in a fiduciary capacity, larceny and embezzlement, is denied.

## VI. <u>Conclusion</u>

The Plaintiffs' motion requests summary judgment with respect to the non-dischargeability of the Debtor's entire debts to each of the Plaintiffs. The Court finds that there are no genuine issues of material fact regarding the amounts of those debts. However, as explained in this opinion, the Plaintiffs are not entitled to a summary judgment finding the entire amounts owing to them are non-dischargeable. Rather, the Plaintiffs are each only entitled to a summary judgment of non-dischargeability in an amount equal to their respective 25% shares of the 401(k) proceeds and the Investment Accounts proceeds.

In their complaint, the Plaintiffs alleged that the amount owed to them from the Debtor's misappropriation of the 401(k) and Investment Accounts proceeds totals approximately $200,000. (Compl., ¶ 86 (Docket #1).) In support of their motion, the Plaintiffs rely on the partial transcript

of the Debtor's Rule 2004 examination and copies of several emails from the Debtor to her former husband, which provide details about the value of the Debtor's interest in the 401(k) proceeds and Investment Accounts proceeds. (Plfs.' Br., Ex. D (Docket #17); Plfs.' Reply, Ex. J (Docket #33).) In her brief, the Debtor disagrees with the Plaintiffs and instead asserts that "75% of the amount of the Funds" was approximately $120,000. (Debtor's Br. at 17 (Docket #24).) The Debtor, however, does not provide any explanation about how she arrived at her figure or otherwise direct the Court to any specific testimony or exhibit to support her position.

There is no dispute about the amount of the 401(k). During her Rule 2004 examination, the Debtor testified that she was entitled to $150,065.64 from the 401(k) and that she received $120,052.51. The difference between these two figures was $30,013.13 for her personal tax withholdings. (Plfs.' Br., Ex. D, Rule 2004 Examination Tr. at 155-56, July 9, 2008 (Docket #17).) The Plaintiffs do not take issue with these amounts. However, quantifying the amount of the Investment Accounts requires a closer examination of the record. During her Rule 2004 examination, the Debtor testified that she received distributions of the following amounts from the Investment Accounts: T.Rowe Price $11,174.29; VanGuard Growth Index Fund Investor Shares $15,554.76; and Ameritrade Clearing $2,067.88. ((Ex. D, Rule 2004 Exam Tr. at 157, 159-60 (Docket #17).) Additional details about the Investment Accounts appear in copies of emails between the Debtor and her former spouse. (Plfs.' Reply, Ex. J (Docket #33).) In these emails, the Debtor specifies the names and amounts in each account that was subject to division based on the Settlement Agreement. The Debtor states in an email of April 23, 2008 that the total amount of the Investment Accounts is $70,092.33. (Plfs.' Reply, Ex. J (Docket #33).) Under the Settlement Agreement, the Debtor is entitled to receive two-thirds of that amount, or $46,728.22.

Using the Debtor's own testimony and exhibits, the Court finds that the total amount that the Debtor was entitled to receive from the 401(k) proceeds and Investment Accounts proceeds was $196,793.86 (i.e., $150,065.64 from the 401(k) and $46,728.22 from the Investment Accounts). This amount is very close to the amount alleged by the Plaintiffs in their complaint. Although the Debtor generally disputes the amounts of the 401(k) proceeds and the Investment Accounts proceeds claimed by the Plaintiffs, the Debtor fails to provide the Court with any support for her position. "[T]here is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" Guarino v. Brookfield Township Trustees, 980 F.2d 399, 404 (6th Cir. 1992) (quoting Street v. J.C. Bradford & Co., 886 F.2d 1472, 1480 (6th Cir. 1989)). Further, the Debtor's own testimony and exhibits actually corroborate the Plaintiffs' position regarding the amounts of the 401(k) proceeds and the Investment Accounts proceeds. The Court concludes that there is no genuine issue of material fact about how much the Debtor was entitled to receive from the 401(k) proceeds and Investment Accounts proceeds.

The Plaintiffs are each entitled to a partial summary judgment under § 523(a)(2)(A) for an amount equal to 25% of the $196,793.86 of proceeds received by the Debtor from the 401(k) and the Investment Accounts. Twenty-five percent of that sum equals $49,198.46. Therefore, Ribitwer is entitled to a partial summary judgment determining the amount of $49,198.46 to be a non-dischargeable debt under § 523(a)(2)(A); Morganroth is entitled to a partial summary judgment determining the amount of $49,198.46 to be a non-dischargeable debt under § 523(a)(2)(A); and Virchow is entitled to a partial summary judgment determining the amount of $49,198.46 to be a non-dischargeable debt under § 523(a)(2)(A). The Court finds that the Plaintiffs are each entitled to a partial summary judgment determining that these same amounts are also non-dischargeable

debts under § 523(a)(6). The Court finds that the Plaintiffs are not entitled to a partial summary judgment determining these amounts to be non-dischargeable debts under § 523(a)(4). Further, the Court finds that there are genuine issues of material fact regarding whether any of the remaining balances of the debts owing to the Plaintiffs by the Debtor in excess of these amounts are non-dischargeable debts under §§ 523(a)(2)(A), (a)(4) or (a)(6). The Court denies the Plaintiffs' motion for summary judgment with respect to those amounts. The Court will enter an order consistent with this opinion.

**For publication.**

Signed on April 10, 2009

       /s/ Phillip J. Shefferly
       Phillip J. Shefferly
       United States Bankruptcy Judge